IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

_____
                                                    )
JOSEPH B. HOLLAND, JR., and                         )
JOE HOLLAND CHEVROLET, INC.,                        )
a West Virginia Corporation,                        )
                                                    )          Civil Action No.
                Plaintiffs,                         )          2:13-cv-15487
                                                    )
        v.                                          )
                                                    )
UNITED STATES DEPARTMENT OF HEALTH                  )
AND HUMAN SERVICES; KATHLEEN                        )
SEBELIUS, in her official capacity as the           )
Secretary of the United States Department of        )
Health and Human Services; UNITED STATES            )
DEPARTMENT OF LABOR; SETH D. HARRIS,                )
in his official capacity as Acting Secretary of the )
United States Department of Labor; UNITED           )
STATES DEPARTMENT OF THE TREASURY;                  )
JACOB J. LEW, in his official capacity as           )
Secretary of the United States Department of the    )
Treasury,                                           )
                                                    )
                Defendants.                         )
_____)


**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

Plaintiffs ask this Court to preliminarily enjoin regulations that are intended to help ensure that women have access to health coverage, without cost-sharing, for preventive services that medical experts deem necessary for women's health and well-being. The regulations require all group health plans and health insurance issuers offering non-grandfathered group or individual health coverage to provide coverage for certain recommended preventive services without cost-sharing (such as a copayment, coinsurance, or a deductible). As relevant here, except as to group health plans of certain non-profit religious employers, the preventive services that must be covered include all Food and Drug Administration ("FDA")-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity, as prescribed by a health care provider.

Plaintiffs, a for-profit automobile dealership and its owner, claim that their sincerely held religious beliefs prohibit them from providing health coverage for certain contraceptive services. Plaintiffs' motion for temporary restraining order and preliminary injunction should be denied at the outset because plaintiffs' inexplicable delay in bringing this action negates any claim of irreparable harm. The regulations plaintiffs challenge were issued almost two years ago. Plaintiffs are not entitled to an injunction, which is an equitable remedy, when they have sat on their purported rights.

In any event, plaintiffs have not shown a likelihood of success on the merits. Plaintiffs' challenge rests largely on the theory that a for-profit, secular corporation can exercise religion and thereby avoid the reach of laws designed to regulate commercial activity. This cannot be. The Supreme Court has recognized that, "[w]hen followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity." *United States v. Lee*, 455 U.S. 252, 261 (1982). Nor can the owner of a for-profit, secular corporation eliminate the legal separation provided by the corporate form, which he has chosen because it benefits him, to impose his personal religious beliefs on the corporate entity's employees. To hold otherwise would permit for-profit, secular companies and

their owners to become laws unto themselves. Because there are an infinite variety of alleged religious beliefs, such companies and their owners could claim countless exemptions from an untold number of general commercial laws designed to protect against unfair discrimination in the workplace and to protect the health and well-being of individual employees and their families. Such a system would not only be unworkable, it would also cripple the government's ability to solve national problems through laws of general application. This Court, therefore, should reject plaintiffs' effort to bring about an unprecedented expansion of free exercise rights.[1]

## BACKGROUND

Before the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010), many Americans did not receive the preventive health care they needed to stay healthy, avoid or delay the onset of disease, lead productive lives, and reduce health care costs. Due largely to cost, Americans used preventive services at about half the recommended rate. *See* INST. OF MED., CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS 19-20, 109 (2011) ("IOM REP."), *available at* http://www.nap.edu/catalog.php?record_id=13181. Section 1001 of the ACA, which includes the preventive services coverage provision relevant here, seeks to cure this problem by making preventive care affordable and accessible for many more Americans. Specifically, the provision requires all group health plans and health insurance issuers that offer non-grandfathered group or individual health coverage to provide coverage for certain preventive services without cost-sharing, including, "[for] women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration [(HRSA)]." 42 U.S.C. § 300gg-13(a)(4).

---

[1] Plaintiffs dramatically overstate the extent to which their arguments have been accepted in similar cases. *See* Pls.' Mem. in Supp. of Mot. for TRO and a Prelim. Inj. ("Pls.' Mem.") at 5 n.1, ECF No. 3, June 24, 2013. To date, the courts that have considered whether a for-profit company and/or its owner are entitled to preliminary injunctive relief over the government's objection are nearly evenly split. *See infra*. The government has not opposed the entry of preliminary injunctions in some cases because of circuit motions panel decisions granting injunctions pending appeal.

Because there were no existing HRSA guidelines relating to preventive care and screening for women, HHS tasked the Institute of Medicine (IOM) with developing recommendations to implement the requirement to provide preventive services for women. IOM REP. at 2.[2] After conducting an extensive science-based review, IOM recommended that HRSA guidelines include, among other things, well-woman visits; breastfeeding support; domestic violence screening; and, as relevant here, "the full range of [FDA]-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity." *Id.* at 10-12. FDA-approved contraceptive methods include diaphragms, oral contraceptive pills, emergency contraceptives (such as Plan B and Ella), and intrauterine devices (IUDs).[3] FDA, Birth Control Guide, *available at* http://www.fda.gov/forconsumers/ byaudience/forwomen/ucm118465.htm. IOM determined that coverage, without cost-sharing, for these contraceptive services is necessary to increase access, and thereby reduce unintended pregnancies (and the negative health outcomes that disproportionately accompany unintended pregnancies) and promote healthy birth spacing. IOM REP. at 102-03.

On August 1, 2011, HRSA adopted IOM's recommendations, subject to an exemption relating to certain religious employers. *See* HRSA, Women's Preventive Services: Required Health Plan Coverage Guidelines ("HRSA Guidelines"), *available at* http://www.hrsa.gov/womensguidelines/. The religious employer exemption, as amended by regulations issued on June 28, 2013, extends to any organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (a)(3)(A)(iii) of the Internal Revenue Code of 1986, as amended, which refers to churches, their integrated auxiliaries, and

---

[2] IOM, which was established by the National Academy of Sciences in 1970, is funded by Congress to provide expert advice to the federal government on matters of public health. IOM REP. at iv.

[3] Although plaintiffs describe Plan B and Ella as abortion-causing drugs, Compl. ¶¶ 47-48, these drugs are not abortifacients within the meaning of federal law. *See, e.g.*, 62 Fed. Reg. 8610, 8611 (Feb. 25, 1997) ("Emergency contraceptive pills are not effective if the woman is pregnant[.]"); 45 C.F.R. § 46.202(f).

conventions or associations of churches, and the exclusively religious activities of any religious order. *See* 78 Fed. Reg. 39,870, 39,896 (July 2, 2013).[4]

## ARGUMENT

## I.  PLAINTIFFS CANNOT ESTABLISH IRREPARABLE HARM

The Court should deny plaintiffs' motion at the outset because plaintiffs' inexplicable delay in bringing this action belies any claim of irreparable harm. The contraceptive coverage requirement was issued on August 1, 2011. Yet plaintiffs waited almost two years to file suit and seek preliminary injunctive relief. "Equity does not favor the dilatory," *Autocam v. Sebelius*, 2012 WL 6845677, at *9 (W.D. Mich. Dec. 24, 2012), and thus, this reason alone provides a sufficient basis for the Court to deny plaintiffs' motion. *See, e.g.*, *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 79-80 (4th Cir. 1989) ("[A] long delay in seeking [preliminary injunctive] relief indicates that speedy action is not required."); *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (noting, in denying preliminary injunction, that delay of forty-four days after final regulations were issued was "inexcusable").[5] In any event, plaintiffs cannot show irreparable harm because, as explained below, they have not shown a likelihood of success on the merits. *See McNeilly v. Land*, 684 F.3d 611, 621 (6th Cir. 2012) (explaining that, in free exercise context, a plaintiff cannot show irreparable harm without likelihood of success on the merits).

---

[4] On June 28, 2013, the government issued final rules that establish accommodations for non-profit religious organizations that object to contraceptive coverage on religious grounds.  *See* 78 Fed. Reg. 39,870.

[5] The Court should also deny plaintiffs' motion because plaintiffs have not established that the challenged regulations will require Joe Holland Chevrolet, Inc. ("Chevrolet") to provide a health plan that includes the contraceptive coverage to which plaintiffs object beginning July 1, 2014. The challenged regulations do not apply to grandfathered plans, and plaintiffs have not alleged any facts, much less submitted any evidence, to show that Chevrolet's health plan is not grandfathered.

## II.   PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS

### A.   Plaintiffs' Religious Freedom Restoration Act Claim Is Without Merit

#### 1.   The regulations do not substantially burden any exercise of religion by a for-profit, secular company and its owner

Under the Religious Freedom Restoration Act ("RFRA"), Pub. L. No. 103-141, 107 Stat. 1488 (1993) (codified at 42 U.S.C. § 2000bb-1), the federal government generally may not "substantially burden a person's exercise of religion, 'even if the burden results from a rule of general applicability.'" *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006) (quoting 42 U.S.C. § 2000bb-1(a)). But the government may substantially burden the exercise of religion if the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

For several reasons, plaintiffs cannot show that the challenged regulations substantially burden any exercise of religion, and thus cannot succeed on their RFRA claim. First, Chevrolet is not an individual or a "religious organization," and thus cannot "exercise religion," under RFRA. Second, because the regulations apply only to the company, and not to its owner, the religious exercise of Mr. Holland is not substantially burdened. And third, any burden imposed by the regulations is attenuated and thus cannot be substantial.

#### a.   *There is no substantial burden on Chevrolet because a for-profit, secular company does not exercise religion*

Plaintiffs' claim that Chevrolet "exercise[s] . . . religion" within the meaning of RFRA, 42 U.S.C. § 2000bb-1(b), cannot be reconciled with the corporation's status as a secular company. The terms "religious" and "secular" are antonyms; a "secular" entity is defined as "not overtly or specifically religious." *See Merriam-Webster's Collegiate Dictionary* 1123 (11th ed. 2003). Thus, by definition, a secular company does not engage in any "exercise of religion," 42 U.S.C. § 2000bb-1(a), as required by RFRA. *See Levitan v. Ashcroft*, 281 F.3d 1313, 1320 (D.C.

5

Cir. 2002); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 83 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003). Numerous courts have rejected RFRA challenges nearly identical to Chevrolet's on this basis. *See Korte v. HHS*, 2012 WL 6553996, at *6 (S.D. Ill. Dec. 14, 2012) ("[T]he exercise of religion [i]s a purely personal guarantee that cannot be extended to corporations." (quotation omitted)), *appeal docketed*, No. 12-3841 (7th Cir. Dec. 18, 2012); *Conestoga Wood Specialities Corp. v. Sebelius*, 2013 WL 140110, at *6-7, 10 (E.D. Pa. Jan. 11, 2013) ("[T]he nature, history and purpose of the Free Exercise Clause demonstrate that it is one of the 'purely personal' rights . . . [that] is unavailable to a secular, for-profit corporation."), *appeal docketed*, No. 13-1144 (3d Cir. Jan. 17, 2013).[6]

Chevrolet is plainly secular. The company's pursuits and products are not religious; it is a for-profit corporation that sells and services automobiles. Compl. ¶ 2. Plaintiffs do not allege that the corporation was organized for carrying out a religious purpose or that its Articles of Incorporation articulate any religious purpose. Nor does the corporation assert that it employs persons of a particular faith. Although defendants do not question the sincerity of Mr. Holland's religious beliefs, the sincere religious beliefs of a corporation's owner do not make the corporation religious. Otherwise, every corporation with a religious owner – no matter how secular the corporation's purpose – would be considered religious, which would dramatically expand the scope of RFRA and the Free Exercise Clause. *See Grote v. Sebelius*, 708 F.3d 850, 856-58 (7th Cir. 2013) (Rovner, J., dissenting) (describing the potential consequences of such an expansion); *see also Autocam*, 2012 WL 6845677, at *7-8.

---

[6] *See also Conestoga Wood Specialities Corp. v. HHS*, 2013 WL 1277419, at *2 (3d Cir. Feb. 8, 2013); *Eden Foods, Inc. v. Sebelius*, 2013 WL 1190001, at *4 (E.D. Mich. Mar. 22, 2013); *Gilardi v. Sebelius*, 2013 WL 781150, at *6-8 (D.D.C. Mar. 3, 2013), *appeal docketed sub nom. Gilardi v. HHS*, No. 13-5069 (D.C. Cir. Mar. 3, 2013); *Briscoe v. Sebelius*, 2013 WL 755413, at *4-5 (D. Colo. Feb. 27, 2013).

By contrast, nearly every court to have ruled against defendants in a similar case has bypassed the question of whether a for-profit, secular corporation can exercise religion under RFRA. *See, e.g.*, *Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 114 (D.D.C. 2012). *But see Hobby Lobby Stores, Inc. v. Sebelius*, 2013 WL 3216103 (10th Cir. June 27, 2013).

The government is aware of no case in which a secular, for-profit employer like Chevrolet ultimately prevailed on a RFRA claim. Because Chevrolet is a secular employer, it is not entitled to the protections of the Free Exercise Clause or RFRA. This is because, although the First Amendment freedoms of speech and association are "right[s] enjoyed by religious and secular groups alike," the Free Exercise Clause "gives special solicitude to the rights of *religious* organizations." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 706 (2012) (emphasis added). The cases are replete with statements like this. *See, e.g.*, *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952) (the Supreme Court's precedent "radiates . . . a spirit of freedom for *religious* organizations, an independence from secular control or manipulation") (emphasis added); *Hosanna-Tabor*, 132 S. Ct. at 706 (Free Exercise Clause "protects a *religious* group's right to shape its own faith and mission") (emphasis added); *Anselmo v. Cnty. of Shasta*, 873 F. Supp. 2d 1247, 1255 (E.D. Cal. 2012). Because RFRA incorporates Free Exercise jurisprudence, the same logic applies. *See Holy Land Found.*, 333 F.3d at 167. In short, only a religious organization can "exercise religion" under RFRA.

Indeed, no court has ever held that a for-profit, secular corporation is a "religious corporation" for purposes of federal law. For this reason, secular companies such as Chevrolet cannot permissibly discriminate on the basis of religion in hiring or firing employees or otherwise establishing the terms and conditions of employment. Title VII of the Civil Rights Act generally prohibits religious discrimination in the workplace. *See* 42 U.S.C. § 2000e-2(a). But that bar does not apply to "a religious corporation." *Id*. § 2000e-1(a). It is clear that Chevrolet does not qualify as a "religious corporation." *See, e.g.*, *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 226 (3d Cir. 2007); *Spencer v. World Vision, Inc.*, 633 F.3d 723, 734, 748 (9th Cir. 2011).

It would be extraordinary to conclude that Chevrolet is not a "religious corporation" under Title VII (and it clearly is not) and thus cannot discriminate in employment on the basis of religion, 42 U.S.C. § 2000e-1(a), but nonetheless "exercise[s] . . . religion" within the meaning of RFRA, *id.* § 2000bb-1(b). Such a conclusion would allow a secular corporation to impose its owner's religious beliefs on its employees in a way that denies those employees the protection of general laws designed to protect their health and well-being. A host of laws and regulations would be subject to attack. Moreover, any secular corporation would have precisely the same right as a religious organization to, for example, require that its employees "observe the [company owner's] standards in such matters as regular church attendance, tithing, and abstinence from coffee, tea, alcohol, and tobacco." *Corp. of the Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 330 n.4 (1987). These consequences underscore why the Free Exercise Clause, RFRA, and Title VII distinguish between secular and religious organizations, with only the latter receiving special protection.[7]

It is significant that Mr. Holland elected to organize Chevrolet as a secular, for-profit entity and to enter commercial activity. "When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity." *Lee*, 455 U.S. at 261; *see also McClure v. Sports & Health Club*, 370 N.W.2d 844, 853 (Minn. 1985) ("By engaging in this secular endeavor, appellants have passed over the line that affords them absolute freedom to exercise religious beliefs."). Having chosen this path, the corporation may not impose its owner's personal religious beliefs on its employees by refusing to cover certain contraceptive services. *Lee*, 455 U.S. at 261.

---

[7] None of the cases plaintiffs cite held that a for-profit, secular corporation may exercise religion, and the government is not aware of any such case, *see Hobby Lobby*, 2013 WL 3216103, at *45 (Briscoe, C.J., concurring in part and dissenting in part). *Sherbert v. Verner*, 374 U.S. 398 (1963); *Wisconsin v. Yoder*, 406 U.S. 205 (1972); *Thomas v. Review Bd. of the Ind. Emp't Sec. Div.*, 450 U.S. 707 (1981), and *Lovelace v. Lee*, 472 F.3d 174 (4th Cir. 2006), involved *individual* plaintiffs, not corporations. *Jimmy Swaggart Ministries v. Bd. of Equalization of Cal.*, 493 U.S. 378 (1990), rejected a free exercise challenge brought by a *non-profit*, *religious* organization.

Sitting *en banc*, a bare majority of the Tenth Circuit recently concluded that two for-profit, secular corporations were likely to succeed on their claim that RFRA gives the corporations the right to deny employees benefits on the basis of religion. *Hobby Lobby*, 2013 WL 3216103, at *9-24. That decision is incorrect for the reasons stated in Chief Judge Briscoe's dissent. Among other things, the majority incorrectly interpreted RFRA to depart from the centuries of jurisprudence that pre-dated the statute's enactment. The Court relied on the Dictionary Act's definition of "person," even though the ultimate question is not whether corporations are "persons" but whether for-profit, secular corporations are persons engaged in the "exercise of religion" within the meaning of RFRA. 42 U.S.C. § 2000bb-1(a). The Dictionary Act is of no help on that point. Instead, as Chief Judge Briscoe correctly explained, the relevant focus is the "200-year span between the adoption of the First Amendment and RFRA's passage," during which "the Supreme Court consistently treated free exercise rights as confined to individuals and non-profit religious organizations." *Id.* at *45 (Briscoe, C.J., concurring in part and dissenting in part). When Congress enacted RFRA to restore pre-*Employment Division v. Smith*, 494 U.S. 872 (1990), free exercise jurisprudence, it was operating in a world where for-profit corporations had never been granted religious exercise rights. Therefore, "there is no plausible basis for inferring that Congress intended or could have anticipated that for-profit corporations would be covered by RFRA." *Id.* at *47 (quotation omitted).

   b. *The regulations do not substantially burden Mr. Holland's religious exercise because the regulations apply only to Chevrolet, a separate and distinct legal entity*

The regulations also do not substantially burden Mr. Holland's religious exercise. By their terms, the regulations apply to group health plans and health insurance issuers. *See, e.g.*, 45 C.F.R. § 147.130. Mr. Holland is neither. Nonetheless, Mr. Holland claims that the regulations substantially burden *his* religious exercise because the regulations require the group health plan sponsored by his for-profit secular *company* to provide health insurance that includes certain

contraceptive coverage. But a plaintiff cannot establish a substantial burden on his religious exercise by invoking this type of trickle-down theory. Indeed, cases that find a substantial burden uniformly involve a direct burden on the plaintiff rather than a burden imposed on another, legally separate, entity. *See, e.g.*, *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 524 (1993); *Potter v. Dist. of Columbia*, 558 F.3d 542, 546 (D.C. Cir. 2009).

Mr. Holland's theory boils down to the claim that what's done to the corporation (or group health plan sponsored by the corporation)[8] is also done to its owner. But, as a legal matter, that is simply not so. Mr. Holland has chosen to enter into commerce and elected to do so by establishing a for-profit, secular corporation, which is a separate legal entity, unique from its officers, directors, and shareholders. *Laya v. Erin Homes, Inc.*, 352 S.E.2d 93, 97 (W. Va. 1986). Indeed, "incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001). As a West Virginia corporation, Chevrolet has broad powers to conduct business, acquire property, and enter into contracts, among others. *See* W. Va. Code § 31D-3-302. The company's owners in turn are generally not liable for the corporation's debts. *Laya*, 352 S.E.2d at 97. In short, "[t]he corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status." *Cedric Kushner*, 533 U.S. at 163.

"It is considered a fundamental rule that [a] shareholder – even the sole shareholder – does not have standing to assert claims alleging wrongs to the corporation." *Smith Setzer & Sons, Inc. v. South Carolina Procurement Review Panel*, 20 F.3d 1311, 1317 (4th Cir. 1994) (quotations omitted). Mr. Holland "'may not move freely between corporate and individual status to gain the advantages and avoid the disadvantages of the respective forms.'" *Potthoff v.*

---

[8] The attenuation here is in fact twice removed, as a group health plan is a legally separate entity from the company that sponsors it. 29 U.S.C. § 1132(d).

10

*Morin*, 245 F.3d 710, 717 (8th Cir. 2001). "So long as the business's liabilities are not [Mr. Holland's] liabilities – which is the primary and 'invaluable privilege' conferred by the corporate form, *Torco Oil Co. v. Innovative Thermal Corp.*, 763 F. Supp. 1445, 1451 (N.D. Ill. 1991) (Posner, J., sitting by designation) – neither are the business's expenditures [Mr. Holland's] own expenditures." *Grote*, 708 F.3d at 858 (Rovner, J., dissenting). The money used to pay for health coverage under Chevrolet's group health plan "belongs to the company, not to [Mr. Holland]." *Id*. Mr. Holland should not be permitted to eliminate the legal separation between the corporation and its owner only when it suits him to impose his personal religious beliefs on the corporate entity's group health plan or its employees. *See Smith Setzer*, 20 F.3d at 1317-18 (refusing to "discard the separate entity doctrine" because doing so would "vitiate the established rule against corporate standing, while disregarding settled theory of corporate law"). For this reason, numerous courts have rejected RFRA challenges nearly identical to Mr. Holland's claim.[9]

    A contrary view would expand RFRA's scope in an extraordinary way. All corporations act through human agency; but that cannot mean that any legal obligation imposed on a corporation is also the obligation of the owners or that the owners' and corporation's rights and responsibilities are coextensive. If that were the rule, any of the millions of shareholders of publicly traded companies could assert RFRA claims on behalf of those companies and thereby impose the owners' or shareholders' beliefs on the companies' employees in a way that deprives

---

    [9] *See MK Chambers Co. v. HHS*, 2013 WL 1340719, at *4 (E.D. Mich. Apr. 3, 2013); *Eden Foods*, 2013 WL 1190001, at *4; *Gilardi*, 2013 WL 781150, at *4-5, 9-10; *Briscoe*, 2013 WL 755413, at *5-6; *Conestoga*, 2013 WL 140110, at *14; *Autocam*, 2012 WL 6845677, at *7; *Korte*, 2012 WL 6553996, at *9-11; *Hobby Lobby Stores, Inc. v. Sebelius*, 870 F. Supp. 2d 1278, 1293-96 (W.D. Okla. 2012), *reversed on other grounds*, 2013 WL 3216103 (10th Cir. June 27, 2013).
    On the other hand, the courts to have granted preliminary injunctive relief in cases similar to this one have uniformly ignored or disregarded the legal separation between corporations and their owners. A company and its owners, however, cannot be treated as alter-egos for some purposes and not others; if the corporate veil is pierced, it is pierced for all purposes. *See, e.g.*, *Nautilus Ins. Co. v. Reuter*, 537 F.3d 733, 738 (7th Cir. 2008); *Korte*, 2012 WL 6553996, at *11; *Autocam*, 2012 WL 6845677, at *7 ("Whatever the ultimate limits of this principle may be, at a minimum it means the corporation is not the alter ego of its owners for purposes of religious belief and exercise."); *Conestoga*, 2013 WL 140110, at *8 ("It would be entirely inconsistent to allow the [corporation's owners] to enjoy the benefits of incorporation, while simultaneously piercing the corporate veil for the limited purpose of challenging these regulations."); *Grote*, 708 F.3d 850, 856 (Rovner, J., dissenting).

those employees of legal rights they would otherwise have, such as by discriminating against the company's employees on the basis of religion in establishing the terms and conditions of employment notwithstanding the limited religious exemption that Congress established under Title VII. This result would constitute a wholesale evasion of the rule that a company must be a "religious organization" to assert free exercise rights, *Hosanna-Tabor*, 132 S. Ct. at 706, or a "religious corporation" to permissibly discriminate on the basis of religion in employment, 42 U.S.C. § 2000e-1(a).

> c.   *Alternatively, any burden imposed by the regulations is too attenuated to constitute a substantial burden*

Although the regulations do not require Chevrolet or its owner to provide contraceptive services directly, plaintiffs' complaint appears to be that, through Chevrolet's health plan and the benefits it provides to employees, plaintiffs will facilitate conduct (the use of certain contraceptives) that they find objectionable. But this complaint has no limits. A company provides numerous benefits, including a salary, to its employees and by doing so in some sense facilitates whatever use its employees make of those benefits. But the owner has no right to control the choices of his company's employees, who may not share his religious beliefs, when making use of their benefits. Those employees have a legitimate interest in access to the preventive services coverage made available under the challenged regulations.

The challenged regulations result in only an indirect and *de minimis* impact on Chevrolet and its owner.  "A series of events must first occur before the actual use of [contraception] would come into play." *Conestoga*, 2013 WL 140110, at *14. "These events include: the payment for insurance to a group health insurance plan that will cover contraceptive services (and a wide range of other health care services); [contraception] must be made available to [the company's] employees through a pharmacy or other healthcare facility; and a decision must be made by [an employee] and her doctor, who may or may not choose to avail themselves of these services." *Id*. In short, "[t]he burden of which plaintiffs complain is that funds, which plaintiffs will

12

contribute to a group health plan, might, after a series of independent decisions by health care providers and patients . . . subsidize *someone else's* participation in an activity that is condemned by plaintiff[s'] religion." *O'Brien v. HHS*, 894 F. Supp. 2d 1149, 1159 (E.D. Mo. 2012). Such an indirect and *de minimis* impact, which is no greater than the company's payment of salaries to its employees that those employees can also use to purchase contraceptives, does not rise to the level of a substantial burden. *See Conestoga*, 2013 WL 140110, at *13 ("The fact that Conestoga's employees are free to look outside of their insurance coverage and pay for and use any contraception . . . through the salary they receive from Conestoga, amply illustrates this point."); *Grote*, 708 F.3d at 861 (Rovner, J., dissenting) ("To the extent this burdens the Grotes' religious interests, it is worth considering whether the burden is different in kind from the burden of knowing that an employee might be using his or her Grote Industries paycheck (or money in a health care reimbursement account) to pay for contraception him or herself."); *Autocam*, 2012 WL 6845677, at *6 (W.D. Mich.) ("The incremental difference between providing the benefit directly, rather than indirectly, is unlikely to qualify as a substantial burden on the Autocam Plaintiffs."), *mot. for inj. pending appeal denied*, No. 12-2673 (6th Cir. Dec. 28, 2012).

Indeed, "if the financial support of which plaintiffs complain was in fact substantially burdensome, secular companies owned by individuals objecting on religious grounds to all modern medical care could no longer be required to provide health care to employees." *O'Brien*, 894 F. Supp. 2d at 1159. RFRA "is not a means to force one's religious practices upon others. [It] does not protect against the slight burden on religious exercise that arises when one's money circuitously flows to support the conduct of other free-exercise-wielding individuals who hold religious beliefs that differ from one's own." *Id.*

In concluding that the regulations impose a substantial burden on the for-profit, secular corporation plaintiffs in *Hobby Lobby*, a majority of the Tenth Circuit found "the line" that the corporations drew with respect to moral culpability controlling. *Hobby Lobby*, 2013 WL

3216103, at *21. This was error. Although "[c]ourts are not arbiters of scriptural interpretation," *Thomas*, 450 U.S. at 716, "RFRA still requires the court to determine whether the burden a law imposes on a plaintiff's stated religious belief is 'substantial.'" *Conestoga*, 2013 WL 140110, at *12. While defendants do not doubt the sincerity of plaintiffs' beliefs, plaintiffs cannot define those beliefs such that they read the term "substantial" out of RFRA. *See Gilardi*, 2013 WL 781150, at *8 ("[T]he Court declines to follow several recent cases suggesting that a plaintiff can meet his burden of establishing that a law creates a 'substantial burden' upon his exercise of religion simply because he claims it to be so."); *Autocam*, 2012 WL 6845677, at *6 ("The Court does not doubt the sincerity of Plaintiff Kennedy's decision to draw the line he does, but the Court still has a duty to assess whether the claimed burden – no matter how sincerely felt – really amounts to a substantial burden on a person's exercise of religion."). "If every plaintiff were permitted to unilaterally determine that a law burdened their religious beliefs, and courts were required to assume that such burden was substantial, simply because the plaintiff claimed that it was the case, then the standard expressed by Congress under the RFRA would convert to an 'any burden' standard." *Conestoga*, 2013 WL 140110, at *13; *see also Autocam*, 2012 WL 6845677, at *7; *Grote*, 2012 WL 6725905, at *6. RFRA's legislative history makes clear that Congress did not intend such a relaxed standard. The initial version of RFRA prohibited the government from imposing any "burden" on free exercise, substantial or otherwise. Congress amended the bill to add the word "substantially," "to make it clear that the compelling interest standards set forth in the act" applies "only to Government actions [that] place a substantial burden on the exercise of" religious liberty. 139 Cong. Rec. S14350-01, S14352 (daily ed. Oct. 26, 1993) (statement of Sen. Kennedy); *see also id.* (text of Amendment No. 1082). For these reasons, any burden imposed by the challenged regulations is not substantial within the meaning of RFRA.[10]

---

[10] *See also Conestoga*, 2013 WL 1277419, at *2; *Grote*, 708 F.3d 850 (Rovner, J., dissenting); *Armstrong v. Sebelius*, Minute Entry, No. 13-cv-563, ECF No. 38 (D. Colo. May 10, 2012) (oral decision read into record); *Eden Foods*, 2013 WL 1190001, at *4; *Conestoga*, 2013 WL 140110, at *13-14; *Annex Med., Inc. v. Sebelius*, 2013 WL 101927, at *4-5 (D. Minn. Jan. 8, 2013), *appeal pending*, No. 13-1118 (8th Cir. Jan. 11, 2013); *Grote Industries, LLC v. Sebelius*, 2012 WL 6725905, at *4-7 (S.D. Ind. Dec. 27,

      **2.**     **Even if there were a substantial burden on religious exercise, the regulations serve compelling governmental interests and are the least restrictive means to achieve those interests**

        *a.*    *The regulations significantly advance compelling governmental interests in public health and gender equality*

"[T]he Government clearly has a compelling interest in safeguarding the public health by regulating the health care and insurance markets." *Mead v. Holder*, 766 F. Supp. 2d 16, 43 (D.D.C. 2011); *see also, e.g.*, *Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 498 (10th Cir. 1998); *Dickerson v. Stuart*, 877 F. Supp. 1556, 1559 (M.D. Fla. 1995). And the challenged regulations further this compelling interest. The primary predicted benefit of the regulations is that "individuals will experience improved health as a result of reduced transmission, prevention or delayed onset, and earlier treatment of disease." 75 Fed. Reg. 41,726, 41,733 (July 19, 2010); *see also* 77 Fed. Reg. 8725, 8727 (Feb. 15, 2012). Indeed, "[b]y expanding coverage and eliminating cost sharing for recommended preventive services, these interim final regulations could be expected to increase access to and utilization of these services, which are not used at optimal levels today." 75 Fed. Reg. at 41,733. Increased access to FDA-approved contraceptive services is a key part of these predicted health outcomes, as a lack of contraceptive use has proven in many cases to have negative health consequences for both women and a developing fetus. As IOM concluded in identifying services recommended to "prevent conditions harmful to women's health and well-being," unintended pregnancy may delay "entry into prenatal care," prolong "behaviors that present risks for the developing fetus," and cause "depression, anxiety, or other conditions." IOM REP. at 20, 103. Contraceptive coverage also helps to avoid "the increased risk of adverse pregnancy outcomes for pregnancies that are too closely spaced." *Id.* at 103.

      Closely tied to this interest is a related, but separate, compelling interest that is furthered by the regulations. As the Supreme Court explained in *Roberts v. United States Jaycees*, 468

_____

2012), *appeal pending*, No. 13-1077 (7th Cir. Jan. 9, 2013).

U.S. 609, 626 (1984), there is a fundamental "importance, both to the individual and to society, of removing the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups, including women." Thus, "[a]ssuring women equal access to . . . goods, privileges, and advantages clearly furthers compelling state interests." *Id.* By including in the ACA gender-specific preventive health services for women, Congress made clear that the goals and benefits of effective preventive health care apply equally to women, who might otherwise be excluded from such benefits if their unique health care needs were not taken into account in the ACA. As explained by members of Congress, "women have different health needs than men, and these needs often generate additional costs. Women of childbearing age spend 68 percent more in out-of-pocket health care costs than men." 155 Cong. Rec. S12106-02, S12114 (daily ed. Dec. 2, 2009). These costs result in women often forgoing preventive care. *See, e.g.*, 155 Cong. Rec. S12265-02, S12274 (daily ed. Dec. 3, 2009); IOM REP. at 19-20. Congress's attempt to equalize the provision of preventive health care services, with the resulting benefit of women being able to contribute to the same degree as men as healthy and productive members of society, furthers a compelling governmental interest. *Cf. Catholic Charities of Sacramento, Inc. v. Superior Court*, 85 P.3d 67, 92-93 (Cal. 2004).

Of course, the government's interest in ensuring access to contraceptive services is *particularly* compelling for women employed by companies that do not currently provide such coverage, like Chevrolet. Taking into account the "particular claimant whose sincere exercise of religion is [purportedly] being substantially burdened," *O Centro*, 546 U.S. at 430-31, exempting Chevrolet and other similar companies from the obligation of their health plans to cover contraceptive services without cost-sharing would remove its employees (and their employees' families) from the very protections that were intended to further the compelling interests recognized by Congress. *See, e.g.*, *Graham v. Comm'r*, 822 F.2d 844, 853 (9th Cir. 1987) ("Where, as here, the purpose of granting the benefit is squarely at odds with the creation of an

exception, we think the government is entitled to point out that the creation of an exception does violence to the rationale on which the benefit is dispensed in the first instance."). Women who work for Chevrolet or similarly situated companies would be, as a whole, less likely to use contraceptive services in light of the financial barriers to obtaining them and would then be at risk of unhealthier outcomes, both for themselves and their newborn children. IOM REP at 102-03. They also would have unequal access to preventive care and would be at a competitive disadvantage in the workforce due to their inability to decide for themselves if and when to bear children. These harms would befall female employees (and covered spouses and dependents) who do not necessarily share Mr. Holland's religious beliefs. Plaintiffs' desire not to provide a health plan that permits such individuals to exercise their own choice must yield to the government's compelling interest in avoiding the adverse and unfair consequences that such individuals would suffer as a result of the company's decision to impose its owner's religious beliefs on them. *See Lee*, 455 U.S. at 261 (noting that a religious exemption is improper where it "operates to impose the employer's religious faith on the employees").[11]

Plaintiffs argue that the interests underlying the regulations cannot be considered compelling when millions of people are not protected by the regulations at the moment. But this is not a case where underinclusive enforcement of a law suggests that the government's "supposedly vital interest" is not really compelling. *Lukumi*, 508 U.S. at 546-47. First, grandfathering is not really a permanent "exemption," but rather, over the long term, a transition

---

[11] Plaintiffs assert that defendants must show a compelling interest as to Chevrolet specifically, as though the government must separately analyze the need for the regulations as to each and every employer and employee in America. But this level of specificity would be nearly impossible to establish and would render this regulatory scheme – and potentially any regulatory scheme challenged due to religious objections – completely unworkable. In practice, courts have not required the government to analyze the impact of a regulation on the single entity seeking an exemption, but have expanded the inquiry to all similarly situated individuals or organizations. *See, e.g., Lee*, 455 U.S. at 260; *United States v. Oliver*, 255 F.3d 588, 589 (8th Cir. 2001) (per curiam); *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1398 (4th Cir. 1990). *O Centro* is not to the contrary, as the Court construed the scope of the requested exemption as encompassing *all* members of the plaintiff religious sect. *O Centro*, 546 U.S. at 433. The Court's warning against "slippery-slope" arguments was a rejection of arguments by analogy – that is, speculation that providing an exemption to one group will lead to exemptions for other non-similarly situated groups. It was not an invitation to ignore the reality that an exemption for a particular claimant might necessarily lead to an exemption for an entire category of similarly situated entities.

17

in the marketplace with respect to several provisions of the ACA, including the preventive services coverage provision. The grandfathering provision reflects Congress's attempts to balance competing interests – specifically, the interest in spreading the benefits of the ACA and the interest in maintaining existing coverage and easing the transition into the new regulatory regime established by the ACA—in the context of a complex statutory scheme. *See* 75 Fed. Reg. 34,538, 34,540, 34,546 (June 17, 2010). This incremental transition does nothing to call into question the compelling interests furthered by the regulations. Even under the grandfathering provision, it is projected that more group health plans will transition to the requirements under the regulations as time goes on. Defendants estimate that, as a practical matter, a majority of group health plans will lose their grandfather status by 2013. *See* 75 Fed. Reg. at 34,552. Thus, any purported damage to the compelling interests underlying the regulations will be quickly mitigated, which is in stark contrast to the *permanent* exemption from the regulations that plaintiffs seek. Plaintiffs would have this Court believe that an interest cannot truly be "compelling" unless Congress is willing to impose it on everyone all at once despite competing interests, but offers no support for such an untenable proposition. *See Legatus v. Sebelius*, No. 12-12061, 2012 WL 5359630, at *9 (E.D. Mich. Oct. 31, 2012) ("[T]he grandfathering rule seems to be a reasonable plan for instituting an incredibly complex health care law while balancing competing interests."), *appeal docketed*, No. 13-1092 (6th Cir. Jan. 24, 2013).[12]

Second, 26 U.S.C. § 4980H(c)(2) does not exempt small employers from the preventive services coverage regulations. *See* 42 U.S.C. § 300gg-13(a); 76 Fed. Reg. 46,621, 46,622 n.1

---

[12] Plaintiffs grossly overstate the number of individuals in grandfathered plans. *See* Pls.' Mem. at 15. Plaintiffs – as well as the *Newland* court – appear to have drawn their "191 million" figure from estimates concerning the total number of health plans existing at the start of 2010, ignoring the fact that the number of grandfathered plans is significantly and steadily declining. *See* Kaiser Family Foundation and Health Research & Educational Trust, Employer Health Benefits 2012 Annual Survey at 7-8, 190, *available at* http://kaiserfamilyfoundation.files.wordpress.com/2013/03/8345-employer-health-benefits-annual-survey-full-report-0912.pdf (indicating that 58 percent of firms had at least one grandfathered health plan in 2012, down from 72 percent in 2011, and that 48 percent of covered workers were in grandfathered health plans in 2012, down from 56 percent in 2011).

(Aug. 3, 2011). Instead, it excludes employers with fewer than fifty full-time equivalent employees from the employer responsibility provision, meaning that, starting in 2014, such employers are not subject to assessable payments if they do not provide health coverage to their full-time employees. *See* 26 U.S.C. § 4980H(c)(2). Employees of these small businesses can get their health insurance through other ACA provisions, primarily premium tax credits and health insurance Exchanges, and the coverage they receive will include all preventive services, including contraception. In addition, small businesses that choose to offer non-grandfathered health coverage to their employees are required to provide coverage for recommended preventive services, including contraceptive services, without cost-sharing.

The only true exemption from the regulations is the exemption for religious employers. 78 Fed. Reg. at 39,896. But there is a rational distinction between this narrow exception and the expansion plaintiffs seek. Houses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people of the same faith who share the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan. *See* 78 Fed. Reg. at 39,874.

The same is not true for Chevrolet, which cannot discriminate based upon religious beliefs in hiring, and therefore almost certainly employs many individuals who do not share the individual plaintiffs' religious beliefs. If courts were to grant plaintiffs' request to extend the protections of RFRA to any employer whose owners or shareholders object to the regulations, it is difficult to see how the regulations could continue to function or be enforced in a rational manner. *See O Centro*, 546 U.S. at 435. Providing for voluntary participation among for-profit, secular employers would be "almost a contradiction in terms and difficult, if not impossible, to administer." *Lee,* 455 U.S. at 258. We are a "cosmopolitan nation made up of people of almost every conceivable religious preference," *Braunfeld v. Brown*, 366 U.S. 599, 606 (1961), and

many people object to countless medical services. If any organization, no matter the high degree of attenuation between the mission of that organization and the exercise of religious belief, were able to seek an exemption from the operation of the regulations, it is difficult to see how defendants could administer the regulations in a manner that would achieve Congress's goals of improving the health of women and children and equalizing the coverage of preventive services for women. *See United States v. Israel*, 317 F.3d 768, 772 (7th Cir. 2003).

> b.   *The regulations are the least restrictive means of advancing the government's compelling interests*

When determining whether a particular regulatory scheme is "least restrictive," the appropriate inquiry is whether the individual or organization with religious objections, and those similarly situated, can be exempted from the scheme – or whether the scheme can otherwise be modified – without undermining the government's compelling interest. *See, e.g.*, *United States v. Wilgus*, 638 F.3d 1274, 1289-95 (10th Cir. 2011). The government is not required "to do the impossible – refute each and every conceivable alternative regulation scheme." *Id.* 1289. Instead, the government need only "refute the alternative schemes offered by the challenger." *Id.*

Instead of explaining how Chevrolet and similarly situated secular companies could be exempted from the regulations without significant damage to the government's compelling interests, plaintiffs vaguely propose "tax credits, deductions, or other similar tax incentives" (Pls.' Mem. at 13), which they claim would be less restrictive. But, just because plaintiffs can imagine an entirely new legislative scheme does not make that scheme a feasible less restrictive means. *See Wilgus*, 638 F.3d at 1289; *Adams v. Comm'r of Internal Revenue*, 170 F.3d 173, 180 n.8 (3d Cir. 1999).

As an initial matter, defendants lack statutory authority to implement plaintiffs' proposal. The ACA requires that recommended preventive services be covered without cost-sharing through the existing employer-based system, and thus, defendants are constrained by statute from adopting plaintiffs' non-employer-based alternative.

Moreover, plaintiffs in effect want the government "to subsidize private religious practices," *Catholic Charities of Sacramento*, 85 P.3d at 94, by expending significant resources to adopt an entirely new legislative scheme. But a proposed alternative scheme is not an adequate alternative – and thus not a viable less restrictive means to achieve the compelling interest – if it is not feasible or plausible. *See, e.g.*, *New Life Baptist Church Acad. v. Town of E. Longmeadow*, 885 F.2d 940, 947 (1st Cir. 1989) (Breyer, J.); *Graham*, 822 F.2d at 852. Plaintiffs' alternative would impose considerable new costs and other burdens on the government and would otherwise be impractical. *See United States v. Lafley*, 656 F.3d 936, 942 (9th Cir. 2011); *New Life Baptist*, 885 F.2d at 947.

Nor would plaintiffs' proposed alternative be equally effective in advancing the government's compelling interests. Congress determined that the best way to achieve the goals of the ACA, including expanding preventive services coverage, was to utilize the existing employer-based system. *See generally* H.R. Rep. No. 111-443, pt. II, at 984-86 (2010). The anticipated benefits of the challenged regulations are attributable not only to the fact that recommended contraceptive services will be available to women with no cost sharing, but also to the fact that these services will be available through the existing employer-based system of health coverage through which women will face minimal logistical and administrative obstacles to receiving coverage of their care. Plaintiffs' alternative, on the other hand, has none of these advantages. It would require women to pay out of pocket for their care in the first instance and would not benefit women who do not have sufficient income to be required to file a tax return. Thus, it is less likely to achieve the compelling interests furthered by the regulations, and therefore does not represent a reasonable less restrictive means.

## B.     The Regulations Do Not Violate The Free Exercise Clause

Plaintiffs' free exercise claim fails at the outset because, as explained above, a for-profit, secular employer like Chevrolet does not engage in any exercise of religion protected by the First

Amendment. But even if it did, the regulations are neutral laws of general applicability and therefore do not violate the Free Exercise Clause. *See Smith*, 494 U.S. at 879. That was precisely the holding of nearly every court to address this claim.[13]

The regulations are neutral because they do not target religiously motivated conduct. *See Lukumi*, 508 U.S. at 533, 545. Their purpose is to promote public health and gender equality by increasing access to and utilization of recommended preventive services, including those for women. The regulations reflect expert recommendations about the medical need for the services, without regard to any religious motivations for or against such services.

Contrary to plaintiffs' assertion, "[c]arving out an exemption for defined religious entities does not make a law non-neutral as to others." *Grote*, 2012 WL 6725905, at *7. Indeed, the religious employer exemption "presents a strong argument in favor of neutrality" by "demonstrating that the object of the law was not to infringe upon or restrict practices because of their religious motivation." *O'Brien*, 894 F. Supp. 2d at 1161 (quotations omitted). The Supreme Court upheld a similar statutory exemption for houses of worship in *Walz v. Tax Commission of New York*, 397 U.S. 664, 672-73 (1970), and this Court should do the same. Nothing in the First Amendment, or the cases interpreting it, requires the government to create an exemption for for-profit, secular companies whenever it creates an exemption for religious organizations. *See, e.g.*, *Amos*, 483 U.S. at 334 (upholding Title VII's exemption for *religious* organizations); *O'Brien*, 894 F. Supp. 2d at 1164 ("Accommodations of religion are possible because the legislative line-drawing to which the plaintiffs object, between the religious and the secular, is constitutionally permissible."); *Droz v. Comm'r of IRS*, 48 F.3d 1120, 1124 (9th Cir. 1995) (concluding religious

---

[13] *See Conestoga*, 2013 WL 1277419, at *2; *MK Chambers*, 2013 WL 1340719, at *5; *Eden Foods*, 2013 WL 1190001, at *5; *Briscoe*, 2013 WL 755413, at *6-7; *Conestoga*, 2013 WL 140110, at *8-9; *Grote*, 2012 WL 6725905, at *7-8; *Autocam*, 2012 WL 6845677, at *5 (W.D. Mich.); *Korte*, 2012 WL 6553996, at *7-8; *Hobby Lobby*, 870 F. Supp. 2d at 1289-90; *O'Brien*, 894 F. Supp. 2d at 1160-62; *see also Catholic Charities of Diocese of Albany v. Serio*, 859 N.E.2d 459, 468-69 (N.Y. 2006); *Catholic Charities of Sacramento*, 85 P.3d at 81-87. *But see Sharpe Holdings, Inc. v. HHS*, 2012 WL 6738489, at *5 (E.D. Mo. Dec. 31, 2012); *Geneva Coll. v. Sebelius*, 2013 WL 838238, at *24-26 (W.D. Penn. Mar. 6, 2013).

exemption from self-employment Social Security taxes did not violate the First Amendment even though "some individuals receive exemptions, and other individuals with identical beliefs do not"); *Diocese of Albany*, 859 N.E.2d at 468-69 ("this kind of distinction – not between denominations, but between religious organizations based on the nature of their activities – is not what [the First Amendment] condemns").

The regulations also are generally applicable because they do not pursue their purpose "only against conduct motivated by religious belief." *Lukumi*, 508 U.S. at 545. They apply to all non-grandfathered health plans that do not qualify for the religious employer exemption or the accommodations for eligible organizations. *See O'Brien*, 894 F. Supp. 2d at 1161-62. Thus, "it is just not true . . . that the burdens of the [regulations] fall on religious organizations 'but almost no others.'" *Am. Family Ass'n v. FCC*, 365 F.3d 1156, 1171 (D.C. Cir. 2004) (quoting *Lukumi*, 508 U.S. at 536); *see also United States v. Amer*, 110 F.3d 873, 879 (2d Cir. 1997). Plaintiffs maintain that the regulations are not generally applicable because they contain certain categorical exceptions. But the existence of "express exceptions for objectively defined categories of [entities]" does not negate a law's general applicability. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1298 (10th Cir. 2004); *see also Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008); *Intercommunity Ctr. for Justice & Peace v. INS*, 910 F.2d 42, 44 (2d Cir. 1990). The exception for grandfathered plans is available on equal terms to all employers, whether religious or secular. And the exemption and accommodations serves to accommodate religion, not to disfavor it. Such categorical exceptions do not trigger strict scrutiny.[14] *O'Brien*, 894 F. Supp. 2d at 1162. Therefore, plaintiffs' free exercise claim fails.[15]

---

[14] In *Lukumi*, 508 U.S. 520, on which plaintiffs rely, the legislature specifically targeted the religious exercise of members of a single church (Santeria) by enacting ordinances that prohibited few, if any, animal killings other than Santeria sacrifices. And *Fraternal Order of Police v. City of Newark*, 170 F.3d 359 (3d Cir. 1999), addressed a policy that created a secular exemption but refused all religious exemptions. The preventive services coverage regulations, in contrast, contain an exemption and accommodations that specifically seek to accommodate religion. Thus, there is simply no basis in this case to infer discriminatory intent on the part of the government. *See Conestoga*, 2013 WL 140110, at *9.

[15] Even if the regulations were not neutral and generally applicable, they would not violate the Free Exercise Clause because they satisfy strict scrutiny. *See supra* pp. 14-21.

### C. The Regulations Do Not Violate The Free Speech Clause

Plaintiffs' free speech claim fares no better, as every court to address this claim has rejected it.[16] The right to freedom of speech "prohibits the government from telling people what they must say." *Rumsfeld v. Forum for Academic & Inst. Rights, Inc.* ("*FAIR*"), 547 U.S. 47, 61 (2006). But the challenged regulations do not require plaintiffs – or any other person, employer, or entity – to say anything. Nor is the conduct required by the regulations "inherently expressive," *id.* at 66, such that it is entitled to First Amendment protection. *See, e.g.*, *Autocam*, 2012 WL 6845677, at *8 ("Including contraceptive coverage in a health care plan is not inherently expressive conduct."); *O'Brien*, 894 F. Supp. 2d at 1166-67 ("Giving or receiving health care is not a statement in the same sense as wearing a black armband or burning an American flag." (internal citations omitted)). Finally, the regulations "do not require funding of one defined viewpoint." *O'Brien*, 894 F. Supp. 2d at 1166. The regulations require that employers offer a health plan that includes coverage for contraceptive services and "patient education and counseling for all women with reproductive capacity," as prescribed by a health care provider. *See* HRSA Guidelines, *supra*. The regulations do not purport to regulate the content of the education or counseling provided or require utilization of any particular services – that is between the patient and her health care provider. Taken to its logical conclusion, "plaintiffs' theory would mean that an employer's disagreement with the subject of a discussion between an employee and her physician would be a basis for precluding all government efforts to regulate health coverage." *O'Brien*, 894 F. Supp. 2d at 1166. The regulations govern conduct, not speech, and thus, plaintiffs' free speech claim fails.

---

[16] *See Conestoga*, 2013 WL 1277419, at *2; *MK Chambers*, 2013 WL 1340719, at *6; *Briscoe*, 2013 WL 755413, at *8; *Conestoga*, 2013 WL 140110, at *16-17; *Grote*, 2012 WL 6725905, at *9-10; *Autocam*, 2012 WL 6845677, at *8; *O'Brien*, 894 F. Supp. 2d at 1165-67; *see also Catholic Charities of Sacramento*, 85 P.3d at 89; *Diocese of Albany*, 859 N.E.2d at 465.

### III.    PLAINTIFFS CANNOT SATISFY THE REMAINING TWO PRELIMINARY INJUNCTION FACTORS

Granting plaintiffs' request for a preliminary injunction would harm both the government and the public. "[T]here is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop and enforce." *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008). Enjoining the regulations as to for-profit, secular companies would undermine the government's ability to achieve Congress's goals of improving the health of women and children and equalizing the coverage of preventive services for women and men. It would also be contrary to the public interest to deny Chevrolet's employees (and their families) the benefits of the preventive services coverage regulations. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Because Chevrolet is a for-profit, secular employer and thus cannot discriminate on the basis of religion in hiring, many of its employees may not share the owners' religious beliefs. Those employees should not be deprived of the benefits of obtaining a health plan through their employer that covers the full range of recommended contraceptive services.[17]

---

[17] Contrary to plaintiffs' assertion, resolution of the appeal in *Liberty University v. Lew*, No. 10-2347 (4th Cir.), is not likely to have a substantial effect on this case. The government has argued that the lawfulness of the contraceptive coverage requirement is not properly before the Fourth Circuit in *Liberty* because the regulations challenged here were not cited in Liberty's complaint or addressed by the district court in the first instance. Moreover, because Liberty qualifies for an enforcement safe harbor for certain non-profit organizations with religious objections to providing contraceptive coverage, the government has raised jurisdictional arguments in *Liberty* that are not applicable here. Nearly every court to address those jurisdictional arguments has granted dismissal or a stay, and thus, it is unlikely the Fourth Circuit will issue a relevant decision on the merits in *Liberty*. In any event, even if the Fourth Circuit's decision in *Liberty* were to touch on any of the issues raised in this case, that is not a basis for granting preliminary injunctive relief. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (explaining the showing plaintiff must make to obtain a preliminary injunction).

Respectfully submitted this 9th day of July, 2013,

STUART F. DELERY
Acting Assistant Attorney General

IAN HEATH GERSHENGORN
Deputy Assistant Attorney General

R. BOOTH GOODWIN II
United States Attorney

JENNIFER RICKETTS
Director

SHEILA M. LIEBER
Deputy Director

 s/Stephen M. Horn
Assistant United States Attorney
WV State Bar No. 1788
United States Attorney's Office
P.O. Box 1713
Charleston, WV  25326
Phone: 304-345-2200
Fax: 304-347-5443
E-mail: steve.horn@usdoj.gov

 s/ Michelle R. Bennett
MICHELLE R. BENNETT (CO Bar No. 37050)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7310
Washington, D.C.  20530
Tel: (202) 305-8902
Fax: (202) 616-8470
Email: michelle.bennett@usdoj.gov

Attorneys for Defendants.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 9, 2013, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system, which sent notice of such filing to all parties.

/s/ Michelle R. Bennett
MICHELLE R. BENNETT
Trial Attorney