Civil Action No. 2:13-cv-15487

# UNITED STATES DISTRICT COURT FOR THE
# SOUTHERN DISTRICT OF WEST VIRGINIA
# (CHARLESTON DIVISION)

**JOSEPH B. HOLLAND, JR.**; and **JOE HOLLAND CHEVROLET, INC.,** a West Virginia Corporation,

    **Plaintiffs**

v.

**THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES**; **KATHLEEN SEBELIUS**, in her official Capacity as Secretary of the United States Department of Health and Human Services; **THE UNITED STATES DEPARTMENT OF LABOR**; **SETH D. HARRIS**, in his official capacity as Acting Secretary of the United States Department of Labor; **THE UNITED STATES DEPARTMENT OF THE TREASURY**; and **JACOB J. LEW**, in his official capacity as Secretary of the United States Department of the Treasury,

    **Defendants**

Civil Action No. 2:13-cv-15487

ECF Case

The Honorable Thomas E. Johnston

---

**BRIEF OF *AMICI CURIAE* THE AMERICAN CIVIL LIBERTIES UNION AND THE AMERICAN CIVIL LIBERTIES UNION OF WEST VIRGINIA FOUNDATION IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

By:   /s/ SARAH ROGERS

Sarah Rogers
ACLU of West Virginia Foundation
WV State Bar No. 11917
P.O. Box 3952
Charleston, WV 25339
T. 304-345-9246
F. 304-345-0207
srogers@acluwv.org

Daniel Mach (*Visiting Attorney Application Pending*)
American Civil Liberties Union Foundation
915 15th St., NW, 6th Floor
Washington, DC 20005

T. 202-675-2330
F. 202-546-0738
dmach@aclu.org

Jennifer Lee (*Visiting Attorney Application Pending*)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
T. 212-549-2601
F. 212-549-2651
jlee@aclu.org


# TABLE OF AUTHORITIES

**CASES**

*Autocam Corp. v. Sebelius*, No. 12-2673, slip op. (6th Cir. Dec. 28, 2012) ................................ 10

*Autocam Corp. v. Sebelius*, No. 12-CV-1096, 2012 WL 6845677 (W.D. Mich. Dec. 24, 2012) (Jonker, J.) ............................................................................................................................ 10, 11

*Bob Jones University v. United States*, 461 U.S. 574 (1983) ..................................................... 6, 7

*Catholic Charities of Diocese of Albany v. Serio*, 859 N.E.2d 459 (N.Y. 2006) ........................... 9

*Catholic Charities of Sacramento, Inc. v. Superior Court*, 85 P.3d 67 (Cal. 2004) ...................... 9

*Conestoga Wood Specialties Corporation v. Secretary of U.S. Department of Health and Human Services*, No. 13-1144, 2013 WL 1277419 (3d Cir. Feb. 8, 2013) ........................................... 11

*Dole v. Shenandoah Baptist Church*, 899 F.2d 1389 (4th Cir. 1990) .................................. 6, 7, 11

*EEOC v. Fremont Christian School*, 781 F.2d 1362 (9th Cir. 1986) .......................................... 10

*EEOC v. Kamehameha Schools/Bishop Estate*, 990 F.2d 458 (9th Cir. 1993) ............................... 5

*Erzinger v. Regents of University of California*, 137 Cal. App. 3d 389 (Cal. Ct. App. 1982) ..... 13

*Goehring v. Brophy*, 94 F.3d 1294, 1297 (9th Cir. 1996), *overruled on other grounds by City of Boerne v. Flores*, 521 U.S. 507 (1997) .................................................................................... 12

*Hobby Lobby, Inc. v. Sebelius*, No. 12-6294, slip op (10th Cir. June 27, 2013) .......................... 11

*Newman v. Piggie Park Enter., Inc.*, 256 F. Supp. 941 (D.S.C. 1966), *aff'd in relevant part and rev'd in part on other grounds*, 377 F.2d 433 (4th Cir. 1967), *aff'd and modified on other grounds*, 390 U.S. 400 (1968) ............................................................................................ 6, 7, 13

*Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992) ..................... 9

*Tarsney v. O'Keefe*, 225 F.3d 929 (8th Cir. 2000) ................................................................. 12, 13

**STATUTES**

42 U.S.C. § 2000e .......................................................................................................................... 10

42 U.S.C. § 2000e-1 ....................................................................................................................... 10

Patient Protection and Affordable Care Act, Pub. L. No. 111-148, sec. 1001, § 2713(a), 124 Stat. 131 (2010) ................................................................................................................................... 2

**OTHER AUTHORITIES**

155 Cong. Rec. at S12020 (daily ed. Dec 1, 2009) ................................................................... 2, 3

155 Cong. Rec. S11979 (daily ed. Nov. 30, 2009) ................................................................... 2, 3

77 Fed. Reg. 8725 ...................................................................................................................... 4, 9

Claudia Goldin & Lawrence F. Katz, *The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions*, 110 J. of Pol. Econ. 730 (2002) ............................................. 8

Cornelia T.L. Pillard, *Our Other Reproductive Choices: Equality in Sex Education, Contraceptive Access, and Work-Family Policy*, 56 Emory L.J. 941 (2007) ............................ 9

Health Resources and Services Administration, U.S. Dep't of Health & Human Services, *Women's Preventive Services: Required Health Plan Coverage Guidelines*, http://www.hrsa.gov/womensguidelines/. ............................................................................... 3-4

INSTITUTE OF MEDICINE, CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS (prepublication ed.) (2011) .......................................................................................... 3, 4-5

Jeffrey Peipert, et al., *Preventing Unintended Pregnancies by Providing No-Cost Contraception*, 120 Obstetrics & Gynecology 1291 (Dec. 2012) ........................................................................ 8

Martha J. Bailey, et al., *The Opt-In Revolution? Contraception and the Gender Gap in Wages* (2012) ....................................................................................................................................... 8

Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 Contraception 491 (June 2010) ..................... 4

**REGULATIONS**

26 C.F.R. § 54.9815-2713 .............................................................................................................. 4

29 C.F.R. § 2510.3-16 .................................................................................................................... 4

29 C.F.R. § 2590.715-2713 ............................................................................................................ 4

45 C.F.R. § 147.130(a)(1)(iv) ........................................................................................................ 4

45 C.F.R. § 147.130(b)(1) .............................................................................................................. 3

45 C.F.R. § 147.131 ....................................................................................................................... 4

45 C.F.R. § 156.50(d) .................................................................................................................... 4

45 C.F.R. § 156.89(d)(1) ................................................................................................................ 4

## INTRODUCTION

The American Civil Liberties Union and the American Civil Liberties Union of West Virginia Foundation (collectively "ACLU") submit this *amicus* brief in support of Defendants' opposition to Plaintiffs' motion for a preliminary injunction, specifically on the issue of whether Plaintiffs are likely to succeed on the merits of their claims. The right to practice one's religion, or no religion, is a core component of our civil liberties and is of vital importance to the ACLU. For this reason, *Amici* routinely bring cases designed to protect the right to worship and express religious beliefs. The ACLU is also fiercely committed to fighting discrimination and inequality, including discrimination based on gender. Indeed, since 1972, the ACLU has worked to secure gender equality and ensure that women and girls are able to lead lives of dignity, free from violence and discrimination. An important component of gender equality is the ability of women to have full control of their reproductive lives and to be able to decide whether and when to have children.

*Amici* do not repeat Defendants' arguments. Rather, *Amici* submit this brief to provide historical context to support Defendants' position that Plaintiffs are unlikely to succeed on the merits of their claim that the federal contraception rule infringes on Plaintiffs' religious liberty. The claims raised by Plaintiffs – that they have a right to discriminate against women and deny them benefits because of the company's owner's religious beliefs – are, unfortunately, not new. In the past, private employers have attempted to use their religious beliefs to evade compliance with anti-discrimination laws. For example, a secular school instituted a "Protestant-only" hiring policy based on the school's founder's religious preferences; employers claimed their right to religious freedom entitled them to pay men – whom they considered to be the head of household based on their religious beliefs – more than women; businesses claimed that their right to

1

religious liberty entitled them to discriminate against African-American customers in public accommodations; and universities claimed a religious liberty right to discriminate against African-American students.  Fortunately, in each of these cases, courts squarely rejected the claims, recognizing that the right to religious liberty does not encompass the right to discriminate against others or evade laws designed to combat discrimination.  This Court should come to the same conclusion here.  Indeed, acceptance of Plaintiffs' claims would not only contravene this clear and consistent precedent, but would also open the door for arguments that countless anti-discrimination and other important laws should be unenforceable in the face of a claim that the discrimination is mandated by a religious belief.

## FACTUAL BACKGROUND

The Patient Protection and Affordable Care Act ("ACA") provides that certain preventive services must be provided in health insurance plans without cost-sharing.  Pub. L. No. 111-148, sec. 1001, § 2713(a), 124 Stat. 131 (2010).  In an effort to help eliminate some forms of gender inequality by equalizing men and women's health care coverage, Congress added the Women's Health Amendment ("WHA") to the ACA, which requires health insurance plans to cover additional preventive services for women.  Pub. L. No. 111-148, sec. 1001, § 2713(a)(4), 124 Stat. 131 (2010).

The WHA was crucial to ensuring that women receive coverage for preventive services.  Indeed, prior to its introduction, coverage for these services was absent from the ACA.  *See* 155 Cong. Rec. S11979, S11987 (daily ed. Nov. 30, 2009) (statement of Sen. Mikulski) (noting that the ACA did not cover key preventive services for women).  In passing the WHA, Senator Reid explained that the WHA was necessary for "millions of women who are being discriminated against . . . ."  155 Cong. Rec. at S12020 (daily ed. Dec 1, 2009) (statement of Sen. Reid).  As

Senator Mikulski noted: "Often those things *unique to women* have not been included in health care reform.  Today we guarantee it and we assure it and we make it affordable by dealing with copayments and deductibles . . . ."  155 Cong. Rec. at S11988 (daily ed. Nov. 30, 2009) (statement of Sen. Mikulski) (emphasis added).  In particular, Congress intended to address gender disparities in out-of-pocket health care costs, much of which stem from reproductive health care:

> Not only do [women] pay more for the coverage we seek for the same age and the same coverage as men do, but in general women of childbearing age spend 68 percent more in out-of-pocket health care costs than men. . . .  This fundamental inequity in the current system is dangerous and discriminatory and we must act.  The prevention section of the bill before us must be amended so coverage of preventive services takes into account the unique health care needs of women throughout their lifespan.

155 Cong. Rec. at S12027 (daily ed. Dec. 1, 2009) (statement of Sen. Gillibrand).

To implement the WHA, the Institute of Medicine ("IOM"), an independent, nonprofit organization that works outside of government to provide unbiased and authoritative advice to decision makers and the public, "review[ed] what preventive services are necessary for women's health and well-being" and developed recommendations for comprehensive guidelines. INSTITUTE OF MEDICINE, CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS 1 (prepublication ed.) (2011) ("CLOSING THE GAPS").  Among other things, the report recommended that the preventive services include "the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity."  *Id*. at 94.  On August 1, 2011, the Department of Health and Human Services ("HHS") adopted these recommendations, including the recommendation on contraceptive services.  *See* 45 C.F.R. § 147.130(b)(1); Health Resources

and Services Administration, U.S. Dep't of Health & Human Servs., *Women's Preventive Services: Required Health Plan Coverage Guidelines*, http://www.hrsa.gov/womensguidelines/.[1]

In announcing the final rule, the government recognized that the ability to access contraception is essential to women's ability to participate fully in society. Indeed, as the government explained, the inability of women to access contraception

> [P]laces women in the workforce at a disadvantage compared to their male co-workers. Researchers have shown that access to contraception improves the social and economic status of women. Contraception coverage, by reducing the number of unintended and potentially unhealthy pregnancies, furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force. . . . The [federal government] aim[s] to reduce these disparities by providing women broad access to preventive services, including contraceptive services.

77 Fed. Reg. 8725, 8728.

In addition, the government recognized that cost is a real barrier to contraceptive access. The IOM found that "[d]espite increases in private health insurance coverage of contraception since the 1990s, many women do not have insurance coverage or are in health plans in which copayments for visits and for prescriptions have increased in recent years." CLOSING THE GAPS at 94. Contraceptive copays can be so expensive that women can pay almost as much out-of-pocket as they would without coverage at all. Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 Contraception 491, 531 (June 2010). Cost barriers are aggravated by the fact that women "typically earn less than men and [] disproportionately have low incomes." CLOSING THE GAPS

---

[1] The contraception rule exempts houses of worship, 45 C.F.R. § 147.130(a)(1)(iv)(A) and (B), and the federal government has modified the rule as applied to religiously affiliated non-profit employers. The modification ensures employees will receive contraception coverage but that the objecting non-profit employer will not bear the cost. *See* 26 C.F.R. § 54.9815-2713; 29 C.F.R. § 2510.3-16, § 2590.715-2713; 45 C.F.R. § 147.130(a)(1)(iv), § 147.131, § 156.50(d), § 156.89(d)(1).

4

at 19. Women who lack access to contraception face "barriers . . . that prevent women from achieving health and well-being for themselves and their families." *Id*. at 20. The federal contraception rule, if undisturbed, will ensure that millions of women have access to contraception without cost barriers, thereby equalizing the health insurance costs between women and men and ensuring women's ability to participate equally in society.

## ARGUMENT

One of the main questions in this case is whether secular, for-profit corporations can discriminate against their female employees by denying them the benefits the government has found to be a critical means of promoting women's equality and eradicating gender discrimination. While today's controversy centers around health insurance benefits for contraception, the plaintiffs' claim – that religious objections can trump neutral laws designed to eradicate discrimination – is not unique to this context. Indeed, it has arisen in numerous other contexts over the last five decades, and has been consistently and resoundingly rejected. For example:

- Twenty years ago, in 1993, a secular, private school maintained a "Protestant-only" hiring policy based on the school's founder's religious beliefs. Based on this policy, the school refused to hire a substitute French language teacher because she was not Protestant. *EEOC v. Kamehameha Schs./Bishop Estate*, 990 F.2d 458 (9th Cir. 1993).

- In 1976, Roanoke Valley Christian Schools added a "head of household" supplement to their teachers' salaries – but only for heads of household as determined by their interpretation of Scripture. For Roanoke Valley, that meant married men. According to the church pastor affiliated with the school, "[w]hen we turned to the Scriptures to determine head of household, by scriptural basis, we found that the Bible clearly teaches that the husband is the

5

head of the house, head of the wife, head of the family." *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1392 (4th Cir. 1990). When sued under the Equal Pay Act, Roanoke Valley claimed a right to an exemption from equal pay laws because its "head-of-household practice was based on a sincerely-held belief derived from the Bible." *Id.* at 1397.

- In 1966, three African-American residents of South Carolina brought a suit against Piggie Park restaurants, and their owner, Maurice Bessinger, for refusal to serve them. Bessinger argued that enforcement of the Civil Rights Act of 1964's public accommodations provision violated his religious freedom "since his religious beliefs compel[led] him to oppose any integration of the races whatever." *Newman v. Piggie Park Enters., Inc.*, 256 F. Supp. 941, 944 (D.S.C. 1966), *aff'd in relevant part and rev'd in part on other grounds*, 377 F.2d 433 (4th Cir. 1967), *aff'd and modified on other grounds*, 390 U.S. 400 (1968).

- In the 1980s, Bob Jones University, a religiously affiliated school in South Carolina, wanted an exemption from a rule denying tax-exempt status to schools that practice racial discrimination. The "sponsors of the University genuinely believe[d] that the Bible forbids interracial dating and marriage," and it was school policy that students engaged in interracial relationships, or advocacy thereof, would be expelled. *Bob Jones Univ. v. U.S.*, 461 U.S. 574, 580 (1983). Bob Jones's lesser-known co-plaintiff, Goldsboro Christian Schools, even opposed integration of the classroom. According to its interpretation of the Bible, "[c]ultural or biological mixing of the races is regarded as a violation of God's command." *Id.* at 583 n.6 (citations omitted).

In each of these cases, entities and individuals tried to invoke the mantle of religious freedom to avoid compliance with laws designed to advance equality, and each time their claims were rejected. As these cases recognized, the right to religious liberty, while fundamental, is not

6

absolute. It does not give businesses or individuals *carte blanche* to discriminate against others, deny others their rights, ignore important laws, or foist their religious beliefs on their employees. As the District Court in South Carolina explained in rejecting the free exercise claim of a restaurant owner who refused to serve African-American customers:

> Undoubtedly defendant . . . has a constitutional right to espouse the religious beliefs of his own choosing, however, he does not have the absolute right to exercise and practice such beliefs in utter disregard of the clear constitutional rights of other citizens. This court refuses to lend credence or support to his position that he has a constitutional right to refuse to serve members of the Negro race in his business establishments upon the ground that to do so would violate his sacred religious beliefs.

*Newman,* 256 F. Supp. at 945.

As these cases make clear, because religious liberty is not absolute it cannot automatically trump laws that were passed to further a compelling government interest. This includes laws designed to promote equality and eradicate discrimination. *See, e.g., Shenandoah Baptist Church*, 899 F.2d at 1398 (religious school must comply with the Equal Pay Act, which was passed to address "serious and endemic problem of employment [gender] discrimination," which is a compelling government interest); *Bob Jones Univ.*, 461 U.S. at 604 (religious school could not be exempt from IRS policy that required such schools to have nondiscriminatory policies, because eradication of racial discrimination in education is a compelling government interest). The same is true here. As discussed above, and as the government points out in its brief, in passing the Women's Health Amendment, Congress sought to eradicate gender discrimination in the context of the provision of health care. In passing the ACA, Congress recognized that women of childbearing age pay substantially more for out-of-pocket health care than men, in part because of the costs of contraception. *See supra* at 3-4. These costs are significant and are a true barrier to women's access to effective birth control; and these financial

7

barriers are aggravated by the fact that women typically earn less than men.[2] *Id.* Congress thus found that equalizing disparities between men and women in this context is crucial. *Id.*

This is particularly true where, as here, the benefit at issue is part and parcel of women's equality in other aspects of their life. The impact of the inability to access contraception falls primarily on women. Access to contraception gives women control of their fertility, enabling them to decide whether and when to become a parent, and allowing women to make educational and employment choices that benefit themselves and their families. For example, researchers have found that the availability of oral contraception has played a significant role in allowing women to attend college and choose post-graduate paths, including law, medicine, dentistry, and business administration. *See* Claudia Goldin & Lawrence F. Katz, *The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions*, 110 J. OF POL. ECON. 730 (2002), *available at* http://www.nber.org/papers/w7527. Indeed, professional degree programs saw a sharp increase in women applicants around the time that oral contraceptives became widely available in 1970. *Id.*

Women's ability to pursue professional careers because of the ability to control whether and when to have children significantly closed the wage gap between men and women. One study attributes to the pill one-third of the total wage gains for women born in the mid-1940s to early 1950s. Martha J. Bailey, et al., *The Opt-In Revolution? Contraception and the Gender Gap in Wages*, 26 (2012), available at http://www-personal.umich.edu/~baileymj/Opt_In_Revolution.pdf. Succinctly put, "[w]omen cannot participate in society, learn, earn, govern, and thrive equally without the ability to determine

---

[2] Indeed, a recent study has shown that when cost barriers to contraception are removed, women choose a highly effective contraceptive method that is right for them, which ultimately results in fewer unintended pregnancies. Jeffrey Peipert, et al., *Preventing Unintended Pregnancies by Providing No-Cost Contraception*, 120 Obstetrics & Gynecology 1291 (Dec. 2012).

8

whether and when to become mothers." Cornelia T.L. Pillard, *Our Other Reproductive Choices: Equality in Sex Education, Contraceptive Access, and Work-Family Policy*, 56 EMORY L.J. 941, 976 (2007); *see also id*. at 975 (recognizing the importance of accessing contraception on the ability to participate in the work force, and without "the means to control and limit reproduction, the average woman would bear twelve to fifteen children in her lifetime"). The Supreme Court has also recognized the direct relationship between women's reproductive health decisions and their equal participation in society: "The ability of women to participate equally in the economic and social life of the Nation has been facilitated by their ability to control their reproductive lives." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 856 (1992).

The federal government is not the only one to recognize and act on these gender disparities and the importance of access to contraception to women's equality. Indeed, 28 states have passed laws requiring employers to cover contraception. 77 Fed. Reg. at 8728. Two of those states, California and New York, faced legal challenges similar to the one at issue here. The high courts of both states rejected those challenges in part because the laws were designed to eradicate gender discrimination in the workplace. *See Catholic Charities of Sacramento, Inc. v. Superior Court*, 85 P.3d 67, 92 (Cal. 2004) (recognizing that the statue was passed to equalize health insurance costs between men and women); *Catholic Charities of Diocese of Albany v. Serio*, 859 N.E.2d 459, 461, 468 (N.Y. 2006) (noting that the purpose of the statute was to advance equal treatment of women). Those courts acknowledged legislative history similar to that here: women pay much more than men in out-of-pocket health care costs, due in part to the cost of prescription contraception. *See Catholic Charities of Sacramento, Inc.*, 85 P.3d at 92; *Catholic Charities of Diocese of Albany*, 859 N.E.2d at 468. Eradicating gender discrimination and disparities in health care costs is undoubtedly a compelling government interest, as

9

recognized by the line of cases discussed above.[3] *See also EEOC v. Fremont Christian Sch.*, 781 F.2d 1362 (9th Cir. 1986) (holding that insurance plan offered only to "head of households," namely men or single persons, violated Title VII and the Equal Pay Act, and rejecting the school's free exercise claim because of the compelling government interest in eradicating gender discrimination). The federal contraception rule clearly furthers the compelling government interest of eliminating gender discrimination in the workplace and ensuring gender equality.[4]

Not only do these neutral anti-discrimination laws further a compelling government interest, but as courts have held, they also minimally – if at all – burden religion. The Sixth Circuit recently denied a motion for an injunction pending appeal in a challenge by another for-profit corporation to the contraceptive rule. *Autocam Corp. v. Sebelius*, No. 12-2673, slip op. at 2 (6th Cir. Dec. 28, 2012) (attached as Ex. A). The court held that the plaintiffs were unlikely to succeed on the merits of their claims in part because of the "reasoned opinion" of the district court. With respect to the plaintiffs' Religious Freedom Restoration Act claim, the district court held that the plaintiffs were unlikely to succeed. *Autocam Corp. v. Sebelius*, No. 12-CV-1096, 2012 WL 6845677, at *5 (W.D. Mich. Dec. 24, 2012). The district court reasoned that abiding by the contraception rule is virtually no different from paying employees a salary, and indeed "[t]he incremental difference between providing the benefit directly, rather than indirectly, is

---

[3] As the government discusses, the rule also furthers the compelling interest in ensuring that women have appropriate health care.

[4] The importance of these interests is not affected by the fact that the ACA requires only those employers with 50 or more employees to provide health insurance, or that the contraception rule exempts houses of worship, but not for-profit employers. *See, e.g.*, Dkt. 3, Pls.' Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction. at 10-12. Indeed, the same is largely true of Title VII of the Civil Rights Act of 1964. That statute applies only to employers with 15 or more employees, and certain religious and religiously identified entities are exempt from the prohibition on discriminating based on an employee's religion. *See* 42 U.S.C. §§ 2000e(b), 2000e-1(a). No court has ever intimated that Title VII's exemptions render the statute unconstitutional as applied to private business owners that seek to use their religious beliefs to discriminate.

unlikely to qualify as a substantial burden on the . . . Plaintiffs." *Id*. at *6. The district court also found that as to the individual owners of the company, the contraception rule is "too attenuated" from any religious objection to contraception and does not require them to "use or buy contraceptives" themselves. *Id*. at *7. Lastly, the court warned of the far-reaching consequences of adopting the plaintiffs' argument that the court should not "look beyond their sincerely held assertion of a religiously based objection to the mandate to assess whether it actually functions as a substantial burden" because such an argument would subject "virtually every government action to a potential private veto based on a person's ability to articulate a sincerely held [religious] objection." *Id*. And "[s]uch a rule would paralyze the normal process of governing." *Id*. The Third Circuit has also denied an injunction pending appeal in a similar challenge to the contraception rule for many of the same reasons. *See Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health and Human Servs.*, No. 13-1144, 2013 WL 1277419 (3d Cir. Feb. 8, 2013). *But see Hobby Lobby, Inc. v. Sebelius*, No. 12-6294, slip op (10th Cir. June 27, 2013) (reversing and remanding district court's denial of a preliminary injunction).

       These decisions are consistent with the historical cases that have held that requiring employers to offer their employees equal benefits does not substantially burden religion. For example, in *Shenandoah*, the court recognized that it would be – at most – a "limited" burden to require the school to comply with the Fair Labor Standards Act ("FLSA") and pay its female teachers the same as men. As the court recognized, "[t]he fact that [the school] must incur increased payroll expenses to conform to FLSA requirements is not the sort of burden that is determinative in a free exercise claim." 899 F.2d at 1398. In *Shenandoah*, the sincerity of the school's religious beliefs was not questioned, but nevertheless the court held that requiring it to abide by neutral anti-discrimination laws did not impose a *substantial* burden on those religious

beliefs. So too here. Despite Plaintiffs' sincerely held religiously based opposition to contraception, requiring Plaintiffs to provide their employees with a health plan that includes contraception coverage does not burden Plaintiffs' religious exercise. The link between the contraceptive coverage requirement and the religiously prohibited behavior is simply too attenuated to amount to a substantial burden. The contraceptive coverage requirement does not require Plaintiffs to physically provide contraception to their employees, nor does it require them to endorse the use of contraception. It merely requires Plaintiffs – like the employer in *Shenandoah* – to provide a nondiscriminatory benefit to its employees. And without this benefit, as discussed above, Plaintiffs' female employees will suffer unequal treatment and disparate health care costs, and may be forced to forgo the most effective methods of contraception.

Furthermore, another line of cases makes clear that Plaintiffs' claimed injury – an objection to contributing to a health plan that provides coverage for health care services the Plaintiffs find objectionable – is not cognizable. In *Goehring v. Brophy*, for example, the court addressed and rejected a RFRA claim similar to Plaintiffs' claim here. 94 F.3d 1294, 1297 (9th Cir. 1996), *overruled on other grounds by City of Boerne v. Flores*, 521 U.S. 507 (1997). In that case, public university students objected to a university's requirement that they pay a registration fee on the ground that it was used to subsidize the school's health insurance program, which covered abortion care. *Id.* The court rejected the plaintiffs' RFRA and free exercise claims, reasoning that the payments did not impose a substantial burden on the plaintiffs' religious beliefs. *Id.* at 1300. Moreover, in *Tarsney v. O'Keefe*, the Eighth Circuit affirmed the dismissal of a free exercise challenge by taxpayers who objected on religious grounds to the state's use of their tax dollars to pay for Medicaid recipients' medically necessary abortions. 225 F.3d 929, 932 (8th Cir. 2000). The payment of taxes that may ultimately subsidize other individuals'

12

Medicaid abortion coverage, the court explained, was too remote an injury even to accord standing upon the plaintiffs to assert a free exercise claim. *Id.* at 936; *accord Erzinger v. Regents of Univ. of Cal.*, 137 Cal. App. 3d 389, 393 (Cal. Ct. App. 1982) ("[T]he fact [that] plaintiffs may object on religious grounds to some of the services the University provides is not a basis upon which plaintiffs can claim a constitutional right not to pay a part of the fees."). Accordingly, just like those who have objected to paying insurance premiums for an insurance plan that others may use to access abortion care, or taxes that pay for Medicaid, which may be used to cover another's abortion, Plaintiffs here cannot claim any cognizable injury by providing their employees with a health plan that covers contraception, which some employees may use.

## CONCLUSION

History has a way of repeating itself. Plaintiffs are attempting to resurrect the long-discredited notion that religion can be used to trump anti-discrimination or other important laws. This Court should follow the wise words from the district court in South Carolina five decades ago, and refuse to "lend credence or support" to the position that entities have a constitutional right to refuse to comply with laws designed to eradicate discrimination. *Newman,* 256 F. Supp. at 945.

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied.

Dated this 10th day of July, 2013   Respectfully submitted,

              */s/* SARAH ROGERS
              Sarah Rogers
              ACLU of West Virginia Foundation
              WV State Bar No. 11917
              P.O. Box 3952
              Charleston, WV 25339
              T. 304-345-9246
              F. 304-345-0207
              srogers@acluwv.org

        Daniel Mach (*Visiting Attorney Application Pending*)
American Civil Liberties Union Foundation
915 15th St., NW, 6th Floor
Washington, DC  20005
T. 202-675-2330
F. 202-546-0738
dmach@aclu.org

Jennifer Lee (*Visiting Attorney Application Pending*)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
T. 212-549-2601
F. 212-549-2651
jlee@aclu.org

14

CERTIFICATE OF SERVICE

I certify that on July 10th, 2013, a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will send electronic notices to all counsel of record. I certify that a copy of the foregoing has been served by certified U.S. Mail upon all parties for whom counsel has not yet entered an appearance electronically:

**Allen R. Prunty**
ROBINSON & MCELWEE
P. O. Box 1791
Charleston, WV 25326
304/344-5800
Fax: 304/344-9566
Email: arp@ramlaw.com
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

**Brian E. Calabrese**
ROBINSON & MCELWEE
707 Virginia Street, East
Suite 400
Charleston, WV 25301
304/344-5800
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

**Hiram S. Sasser , III**
LIBERTY INSTITUTE
2001 W. Plano Parkway
Suite 1600
Plano, TX 75075
972/941-4444
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

**Jeffrey C. Mateer**
LIBERTY INSTITUTE
2001 W. Plano Parkway
Suite 1600
Plano, TX 75075
972/941-4444
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

**Jeremiah G. Dys**
FAMILY POLICY COUNCIL OF

WV
P. O. Box 566
Charleston, WV 25322
304/881-5196
Email: jeremydys@gmail.com
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

**Kent J. George**
ROBINSON & McELWEE
P. O. Box 1791
Charleston, WV 25326-1791
304/344-5800
Fax: 344-9566
Email: kjg@ramlaw.com
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

**William C. Porth**
ROBINSON & McELWEE
P. O. Box 1791
Charleston, WV 25326-1791
304/344-5800
Fax: 304/344-9566
Email: wcp@ramlaw.com
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

**COUNSEL FOR PLAINTIFFS**

**Michelle Renee Bennett**
US Department of Justice - Civil Division
20 Massachusetts Ave NW
Room 7310
Washington, DC 20001

202-305-8902
Fax: 202-616-8470
Email: michelle.bennett@usdoj.gov
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

**COUNSEL FOR ALL DEFENDANTS**

                                              /s/ SARAH ROGERS
                                              Sarah Rogers